Argued September 11, 1969, reversed and remanded May 28,
petition for rehearing denied July 21, 1970

HIGGINS ᴇᴛ ᴜx, *Respondents, v.* INSURANCE
COMPANY OF NORTH AMERICA, *Appellant.*

469 P2d 766

*Thomas M. Triplett*, Portland, argued the cause for appellant. With him on the briefs were Mautz, Souther, Spaulding, Kinsey & Williamson.

*William E. Flinn*, Eugene, argued the cause for respondents. On the brief were Jaqua, Wheatley & Gardner.

154

Before PERRY,[*] Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN,[**] DENECKE and HOLMAN, Justices.

McALLISTER, J.

This is an action on a fire insurance policy in which the trial court found for plaintiffs and defendant Insurance Company of North America appeals. The principal questions on appeal are whether plaintiffs had an insurable interest in the insured premises, the effect on plaintiffs' claim of other insurance on the same property, whether the filing of a proof of loss was waived, and the amount plaintiffs were entitled to recover under the terms of the policy.

There is little dispute about the facts. John Vickroy owned a house and lot at 943 Lorane Highway in Eugene which he wanted to sell. On April 21, 1966, after some negotiation between the parties, an earnest money receipt was executed by plaintiff Linn D. Higgins and Vickroy by which plaintiffs agreed to buy the property for $8,000 and to pay the purchase price at the rate of $85 per month commencing May 15, 1966. The agreement also required four additional payments of $500 each, payable quarterly commencing August 15, 1966.

Plaintiff did not purchase the property for a home, but intended to renovate it for resale. Within a day or two after the earnest money agreement was signed the plaintiffs took possession of the property and began renovation. Higgins testified that after he took possession he worked evenings and Saturdays on the

---

[*] Perry, C.J., did not participate in this decision.
[**] Goodwin, J., resigned December 19, 1969.

house doing general cleanup work, painting the exterior, stripping the kitchen and bath and preparing to install new cabinets in the kitchen.

On May 3, 1966, defendant's policy involved in this action was issued to plaintiffs by the Smith and Crakes Agency of Eugene. The policy covered the Lorane Highway property against loss by fire up to $17,000, which Higgins told the agent would be the value of the premises when the house was renovated. The first annual premium was paid. The policy made no mention of Vickroy's interest in the property.

Vickroy had a $10,000 policy of fire insurance covering the premises, also issued by the Smith and Crakes Agency, but in the South Carolina Insurance Company.

On May 15, 1966, the plaintiffs paid Vickroy the $85 payment on the purchase price due on that date. No other payments on the purchase price were made.

On June 4 the house was badly damaged by fire. Smith and Crakes hired an adjuster to adjust the loss on behalf of both the South Carolina Insurance Company and defendant Insurance Company of North America. There was some delay in adjustment while the authorities were investigating the fire, but ultimately the South Carolina Insurance Company paid Vickroy $6,756.55 in settlement under its policy. The defendant did not pay on its policy and plaintiffs brought this action. The trial court found plaintiffs were entitled to recover the policy limit of $17,000, plus $5,000 attorneys' fees, and entered judgment against defendant for $22,000.

■ The defendant first asserts that the court erred in finding that plaintiffs had an insurable interest in the premises. Since this is an action at law we are bound

by the findings of the trial court on issues of fact. We inquire only whether there is evidence to support the findings.

■ The law is clear that the insured must have an insurable interest in the property, both when the contract of insurance is made and when the loss occurs. *Armbrust v. Travelers Ins. Co.*, 232 Or 617, 376 P2d 669 (1962); *Yoshida v. Security Ins. Co.*, 145 Or 325, 336, 337, 26 P2d 1082 (1933); *Hardwick v. State Insurance Co.*, 20 Or 547, 550, 26 P 840 (1891); *Chrisman v. State Ins. Co.*, 16 Or 283, 18 P 466 (1888).

Defendant contends that the plaintiffs had no insurable interest because the earnest money receipt was unenforceable. Defendant attacks the earnest money receipt on three grounds: (1) inadequate description; (2) uncertainty as to the amount of the purchase price; and (3) uncertainty as to the parties. Defendant expressly disclaims any reliance on the Statute of Frauds. Its claim is that the terms of the agreement are so indefinite that there is nothing a court could enforce—in effect, that there was no contract.

The earnest money receipt is a printed form, which was completed in longhand. It states that the subject property is located in Eugene, Lane County, Oregon. In the space provided for a description of the property is written "description to be furnished. North 70' of description in Title Policy." According to evidence at the trial, the title policy referred to had been prepared in connection with an earlier sale of the property, and was in the files of the escrow company at whose offices the agreement was prepared and executed, and where Higgins was to make his payments. The title policy is not in evidence.

■■ The fact that the property was not properly de-

scribed in the writing does not necessarily mean that as between the parties the contract was unenforceable. In deciding disputes between the parties to a land sale contract, courts, including this one, have often held that evidence showing that both parties clearly understood what land was intended, or that the seller had put the purchaser into possession of a particular tract, would cure uncertainties in the contract description of the land. In *Guillaume v. K. S. D. Land Co.*, 48 Or 400, 86 P 883, 88 P 586 (1907), the contract described the property as a tract designated by a number on an unrecorded map on file in the office of the seller. The county, township, and range where it was located were admitted in the pleadings. This court held the description sufficient to allow enforcement of the contract, relying in part on the fact that the purchaser had gone into possession. The opinion stated the applicable rule as follows:

"* * * The rule is quite general that if the description clause of real property as stated in a written instrument is vague, the construction of the language used that has been placed upon it by the parties may be shown by parol evidence as tending to identify the premises intended * * *. Thus, when possession of real property is taken pursuant to an agreement of the vendor, the occupation of the premises by the vendee may render certain what otherwise would have been a vague description of the land intended by the parties * * *." 48 Or at 406.

In *Richards v. Snider, et al.*, 11 Or 197, 3 P 177 (1883), a vendee sought to compel specific performance of a written agreement for the sale of "lot 8, sec. 19, 4 N., 35 E." The agreement provided that "said Richards to be entitled to immediate possession of said lot 8." The complaint alleged that the language of the description

referred to a certain township and range in Umatilla County, and that Richards had received possession from Snider under the agreement. The trial court sustained a demurrer to the complaint, but this court reversed. It was held that the written agreement adequately disclosed the parties' intention to contract with reference to a particular tract and no other.

> "* * * It is clearly a case admitting of the identification of the subject of the contract by proof of extrinsic facts * * *. And the facts admissible and effectual for this purpose, which are alleged in the complaint, and admitted by the demurrer, seem ample. The possession alone, taken under the circumstances alleged, and in view of the stipulation for possession in the written agreement itself, should be held a sufficient identification. * * *"
> 11 Or at 199-200.

See, also, *Skinner v. Furnas*, 82 Or 414, 425, 161 P 962 (1916); *Crawford v. Carter*, 72 SD 514, 37 NW2d 241 (1949); *Suchan v. Swope*, 357 Pa 16, 53 A2d 116 (1947); *Thurman v. Trim*, 199 Kan 679, 433 P2d 367 (1967).

The uncontroverted evidence in this case shows that Vickroy owned a piece of property on the Lorane Highway with a total frontage of 140 feet, that there was a house on the north 70 feet, and that this portion of the property was designated as 943 Lorane Highway. The house had been the Vickroy residence. Higgins offered to buy the north 70 feet, on which the house was located, and his offer was accepted. The earnest money receipt provided that possession was to be delivered to the purchaser on or about April 25, 1966, and Higgins testified that he went into possession and began renovation of the house within a day or two after April 21. He made the first monthly pay-

ment, the only one which had become due prior to the fire.

■ We hold that the property involved in this case was sufficiently identified by the evidence to support the finding that the contract was enforceable.

■ The contention that the sale price was indefinite is not well taken. The earnest money receipt states that the property is sold to the purchaser "for the sum of eight thousand 00/100 ($8000.00) Dollars". The $8,000 was

"payable in installments of not less than $85.00, including 7% interest, monthly, beginning May 15, 1966 and the 15th day of each month thereafter until May 15, 1968 at which time the entire unpaid balance, including interest, shall be due and payable; ALSO: beginning not later than Aug. 15, 1966 and each calendar quarter thereafter purchasers shall pay an additional $500.00 on principal until $2000.00 additional has been paid."

Below Vickroy's signature and immediately above that of Higgins, there is the following:

"I hereby agree to purchase the above property and to pay the price of eight thousand 00/100— ($8,000.00) Dollars as specified above."

Mr. Higgins testified that his offer of $8,000 was accepted by Mr. Vickroy. Clearly the evidence was sufficient to support a finding that the parties had agreed on a sale price of $8,000.

■ The amended complaint alleges that "Linn D. Higgins and Betty J. Higgins were the contract purchasers and equitable owners" of the insured property. The earnest money receipt lists the names of Linn D. Higgins and Betty J. Higgins as purchasers, but only Mr. Higgins signed the agreement. Defendant does not

elaborate on its statement that this discrepancy makes the agreement too uncertain to enforce, and we are not convinced by the bare assertion. Even if Mrs. Higgins was not a party to the contract, Mr. Higgins' signature was sufficient to bind him. As to him there is no uncertainty; he had an obligation to pay the purchase price if Vickroy chose to enforce the contract. In the trial court, defendant neither moved for a nonsuit as to Mrs. Higgins nor objected to entry of the judgment in her favor.

In approving the finding of the trial court that the contract was enforceable we do not mean to imply that a purchaser under an unenforceable contract of sale can never have an insurable interest in the property. There are cases which have found such an insurable interest under various fact situations. *Wainer v. Milford Mutual Fire Ins. Co.*, 153 Mass 335, 26 NE 877 (1891); *Bernhardt v. Boeuf & Berger Mutual Insurance Co.* (Mo App 1959) 319 SW2d 672; *Delanty v. Yang Tsze Ins. Ass'n.*, 127 Wash 238, 220 P 754 (1923). We do not have to consider that question in this case.

■ Defendant next contends that the court erred in awarding plaintiffs the policy limit of $17,000 under the provisions dealing with "Replacement Cost" rather than the actual cash value of the property at the time of loss, which, according to the evidence, was $6,500.

The first page or face of the policy insured the insured "to the extent of the actual cash value of the property at the time of loss" against "all direct loss by fire" to the property described in the policy. We shall refer to this as the basic coverage.

Page 4 of the policy is entitled "Provisions Applicable to the Entire Policy" and contains 13 lettered paragraphs, each dealing with a separate subject.

Paragraph f is entitled "Replacement Cost" and contains seven numbered subparagraphs. We are concerned primarily with subparagraphs (2), (5) and (7), which read as follows:

"(2) If at the time of loss the limit of liability for the dwelling in Coverage A of this policy is eighty per cent (80%) of the full replacement cost of the dwelling insured, Coverages A and B only of this policy are extended to include the full cost of repair or replacement without deduction for depreciation.

\* \* \* \* \*

"(5) This Company's liability for loss under Coverages A and B of this policy, including this replacement cost provision, shall not exceed the smallest of the following amounts: (a) The limit of liability for Coverage A or B, whichever applies; (b) The replacement cost of the building structure or any part thereof identical with such building structure on the same premises and intended for the same occupancy and use; (c) The amount actually and necessarily expended in repairing or replacing said building(s) or any part thereof intended for the same occupancy and use.

\* \* \* \* \*

"(7) The insured may elect to disregard this replacement cost provision in making claim under this policy, but such election shall not prejudice the Insured's right to make further claim within a reasonable time after loss for any additional liability brought about by this replacement cost provision."

It is conceded that, if the policy did not contain subparagraph (5) plaintiffs would be entitled to recover $17,000 under the provisions of subparagraph (2). The policy insures a dwelling under Coverage A and the 80% requirement of subparagraph (2) is met.

Defendant contends that subparagraph (5) limits its liability to the smallest of three amounts, and that

the smallest of the three, clause (c), is "The amount actually and necessarily expended in repairing or replacing said building(s) or any part thereof intended for the same occupancy and use." There is no evidence that plaintiffs expended anything after the fire for replacement or repair of the insured building. Defendant contends that since plaintiffs have expended nothing in repairing or replacing the insured building they are entitled to nothing under the replacement clause provisions of the policy, but are entitled only to the actual cash value of the insured property under the basic coverage.

Since the amount of recovery turns on whether the basic coverage or the replacement cost extension is applicable we need to consider the relationship of the alternative coverages. The purpose of Replacement Cost insurance is explained in Fire, Casualty & Surety Bulletins published by The National Underwriter as follows:

"Though the concept underlying the use of actual cash value as a Property insurance standard is sound, beyond challenge, the business has for many decades recognized that its strictest application can and does leave uninsured a very real source of potential loss. A property owner may indeed realize a betterment through the reconstruction of a damaged building, but that betterment may be one for which he cannot at the time of loss afford to pay. In other words, one's building may be, say 25% depreciated at the time of loss, but he needs sufficient funds with which to replace the building and the depreciation may represent nothing more to him at that time than an accounting entry. To be prepared for this contingency, he must have some sort of reserve. Otherwise, whatever the theory—depreciation, betterment, use, indemnity— this man is faced with an eminently *practical prob-*

*lem* which may quite realistically be viewed as an *insurable risk of loss.*

"The recognition of this element of risk led to what the business now speaks of as *Replacement Cost insurance.* Fundamentally, this is any type of coverage under which the insurance company agrees, in effect, to pay *the difference* between actual cash value and full replacement cost. What is insured, therefore, is *depreciation* and, in fact, some of the earliest approaches to this protection involved *specific additional amounts* of coverage of this part of the exposure, hence, the early (and still not entirely extinct) title 'Depreciation insurance.' "[1]

The following explanation of replacement cost insurance is taken from Magee and Bickelhaupt, General Insurance (7th ed 1964) at 309:

"*Depreciation insurance,* sometimes called *replacement cost* insurance, pays for full replacement cost new of the insured property, without deduction for depreciation. It provides indemnity for the expenditures the insured is obliged to make over and above the amount of the loss covered by full insurance under the standard fire policy in order to restore the property to its full usefulness as before the loss or damage. Depreciation insurance substitutes a figure representing the cost of replacement new for the term 'actual cash value.' "

It appears that replacement cost insurance has been written only under very definite limitations. The basic limitation is that "the insured collects on this 'new for old' basis only if the property is repaired or replaced."[2] The "Replacement Requirement" is described in F. C. & S. Bulletins, Dwellings, Rc-2, June, 1966, as follows:

"There is to be no recovery of the part of the

[1] F. C. & S. Bulletins, Fire & Marine Section, Misc. Fire, Acb-1, Third Printing, Sept. 1966.

[2] F. C. & S. Bulletins, Fire & Marine Section, Misc. Fire, Acd-1, Second Printing, Sept. 1966.

loss which exceeds the actual cash value of the damaged part *unless and until actual repair or replacement is completed.* In other words, repair or replacement is *prerequisite* to recovery under the extension. The insured can submit a claim for *actual cash value* when he chooses and collect any *additional amount* he may have coming under the Replacement Cost extension subject to a requirement that the additional claim be made *within 180 days* after the loss. (The number of days is 120 in some states.)" [The policy involved in this case specifies "a reasonable time after loss."]

Other statements of the foregoing underwriting rule include the following:

"* * * In the usual course, liability under the policy accrues on an actual cash value basis until repair or replacement has actually been effected. This means that if the property is not repaired or replaced, the only liability of the company will be on an actual cash value basis. Some companies specify a time limit within which repair or replacement must be completed. It is usual to provide that repairs or replacements shall be completed with due diligence and dispatch, ordinarily within 12 months." Magee and Bickelhaupt, op. cit. supra at 310.

"* * * As is usual with replacement-cost coverage, the contract provides that the company shall not be liable for any loss until the actual repair or replacement is completed. Also, the measure of replacement cost is the cost of replacing the building or any part of it with a building identical to the insured building on the same premises and intended for the same occupancy and use. Furthermore, in no event can the recovery under replacement-cost insurance be more than the amount *actually and necessarily expended* in repairing or replacing the building intended for the same occupancy and use.

\* \* \*" (Emphasis supplied.) Mehr and Cammack, Principles of Insurance (4th ed 1966) at 202.

■ The purpose of repair or replacement as a condition precedent to recovery under Replacement Cost insurance is protection against the moral hazard. This thought is expressed in Magee and Bickelhaupt, op. cit. supra at 309, as follows:

"Not all insurers are willing to write insurance in an amount sufficient to insure the full replacement cost of the insured property. They point out that there is an element of moral hazard in providing insurance that will replace in its entirety an old and partly obsolete building in a new condition. There are others who contend that in most instances the element of moral hazard is negligible and that an insured has every right to buy insurance that will place him back in business after a fire without contributing to the replacement cost of his building an amount measured by depreciation."

and in Mehr and Cammack, op. cit. supra at 201-202:

"Some insurance authorities believe that to pay the replacement cost without a charge for depreciation not only would be a violation of the principle of indemnity but also would create a moral hazard. Even so, insurance can be written to pay the actual cost of repairing or replacing damaged property without deduction for depreciation. Replacement cost insurance simply offers an additional amount of protection for the difference between the actual cash value of the loss and the cost of restoring the damaged property."[9]

The limitations on recovery under the replacement cost provision of the policy involved in this case closely

[9] See, also, for another expression of the moral risk as the reason underlying the repair or replacement requirement, F. C. & S. Bulletins, Fire & Marine Section, Misc. Fire, Acd-3, Third Printing, August 1967.

parallel the usual limitations as described in F. C. & S. Bulletins as follows:

> "Replacement Cost insurance does *not* provide *valued coverage.* A loss under this type of form is adjusted in the same manner as one under a conventional form, the difference being that *depreciation*—routinely deducted whenever feasible is an actual cash value loss—is not considered.
>
> "The Replacement Cost endorsement specifies that the insurer is to pay not more than the *smallest* of three amounts:
>
> "1. The amount of the policy applicable to the damaged or destroyed property.
>
> "2. The replacement cost of the property (or part thereof) *identical* with the insured property, *on the same premises* and *intended for the same occupancy and use.*
>
> "3. The *actual* and necessary *expenditure* in repairing or replacing the insured property. Note that this limit no longer refers to replacement *on the same premises.* * * *"[④]

■ The reasons for limiting recovery to the amount actually expended for repair or replacement seem reasonable, and such a limitation should be enforced if it is clearly stated in the insurance contract. We think that the language employed in the policy under consideration is sufficiently clear, and that the intent to limit the company's liability to amounts actually expended is apparent from a careful reading of the replacement cost provision. We conclude that since plaintiffs have not expended anything in repairing or replacing the insured building they are not eligible to recover under the "Replacement Cost" extension of the policy. For a similar conclusion see *Bourazak v. North*

[④] F. C. & S. Bulletins, Fire & Marine Section, Misc. Fire, Acd-4 and 5, Third Printing, August, 1967.

*River Insurance Company,* 379 F2d 530 (7th Cir. 1967).[6]

Plaintiff's recovery, then, is under the basic coverage of the policy. There is evidence in the record from which the trial court can make findings as to the appropriate amount. The judgment should be modified according to these findings, and should represent what the trial court finds to be the actual cash value of the property at the time of the loss as defined in the policy.

Defendant next contends that any recovery to which plaintiffs are entitled under the policy should be reduced by the amount paid to Vickroy by his insurance company. Vickroy was paid $6,756.55, which was computed by prorating the estimated replacement cost, $18,242.68, on the basis of the policy limits of the two policies.

Defendant first asserted this contention in its answer where it alleged that after the fire "another insurance company under a different policy paid $6,756.55 to John Vickroy who claimed to be the owner of said property." Defendant alleged that "said loss" had been satisfied in whole or at least to the extent of $6,756.55.

Defendant relies on the rule that where the purchaser, as equitable owner, will bear the loss caused by a fire occurring before the sale is completed the proceeds of the vendor's insurance constitute a "trust fund" for the benefit of the purchaser to be credited on the purchase price of the property. See 64 ALR2d at 1406, where the cases are collected.

---

[6] We think Reese v. Northern Insurance Company of New York, 207 Pa Super 19, 215 A2d 266 (1965), was wrongly decided and to the extent that Ruter v. Northwestern Fire and Marine Ins. Co., 72 NJ Super 467, 178 A2d 640 (1962) is inconsistent with this opinion we find it unpersuasive.

■ We could sustain defendant's contention only if we could hold as a matter of law that John Vickroy must credit the proceeds of his insurance policy on the purchase price due from plaintiffs. We decline to consider such a holding in an action to which Vickroy is not a party. Vickroy is entitled to his day in court before he is deprived of the amount paid to him by his insurer under policy provisions and circumstances of which we have no knowledge.

The rule relied on by defendant, although applied by many courts in some circumstances, is by no means universal. See *Brownell v. Board of Education*, 239 NY 369, 146 NE 630 (1925); *White v. Gilman*, 138 Cal 375, 71 P 436 (1903); *McCoy v. Continental Ins. Co.*, 326 Mich 261, 40 NW2d 146 (1949); 64 ALR2d 1404. This court has never applied the rule, although it was adverted to in dicta in *Strong v. Moore*, 105 Or 12, 207 P 179, 23 ALR 1217 (1922). Vickroy had an insurable interest in the premises which he was entitled to insure for his own protection. Plaintiffs have not asked for the benefit of that insurance. Whether they could claim the benefit of that insurance cannot be decided in this case.

When plaintiffs went into possession of this property they assumed the risk of its destruction pursuant to ORS 93.290® and thereafter had an insurable in-

---

® "Any contract made on or after August 3, 1955, in this state for the purchase and sale of realty shall be interpreted as including an agreement that the parties shall have the following rights and duties, unless the contract expressly provides otherwise:

\* \* \* \* \*

"(2) If, when either the legal title or the possession of the subject matter of the contract has been transferred, all or any part thereof is destroyed without fault of the vendor or is taken by eminent domain, the purchaser is not thereby relieved from a duty to pay the price, nor is he entitled to recover any portion thereof that he has paid."

terest in the property which entitled them to insure it for its full value. In this action plaintiffs claim only the amount due them under the terms of the policy issued to them by defendant. We need not speculate about the result if defendant had interpleaded Vickroy and his insurer or made them parties to this case. We find no merit in this contention by defendant.

The next assignment of error concerns the policy requirement that the insured furnish the company a proof of loss.[7] Plaintiffs alleged that defendant had waived this requirement by failing to provide the necessary forms. A statute in effect at all times relevant to this action provided:

> "The company shall, within a reasonable time after receipt of notice of loss, furnish to the insured printed blanks for making the proof of loss required by the standard form of policy prescribed by ORS 744.100. The furnishing of such blanks shall not be deemed in itself an admission of liability on the part of the company. The insured shall have 90 days after receipt of such blanks to furnish proof of loss notwithstanding anything contained in the standard form of policy."[8]

Defendant urges us to construe the statute to require that the insured request that the forms be furnished before the company's failure to furnish them can amount to a waiver. That is the effect of the present statute, ORS 743.093,[9] as the result of a 1967 amend-

---

[7] The policy provides:

"The insured shall give immediate written notice to this Company of any loss * * * and within sixty days after the loss, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, * * *."

[8] ORS 744.150, now amended and renumbered ORS 743.093.

[9] ORS 743.093 now provides:

"(1) An insurer shall furnish, upon written request of any

ment. Defendant argues that the amendment was merely a clarification of the original provision rather than a change in legislative policy.

■ On its face, however, the statute was quite clear. It specified when the company was to furnish the forms —within a reasonable time after receipt of notice of loss—and when the insured was to furnish proof of loss—within 90 days after receipt of the forms. It left nothing to be supplied by the court, and provided by its own terms that it need not be reconciled with the statutory policy provisions. Although it did not speak of waiver, it is clear that under the statute the insured's duty to furnish proof of loss did not arise until the company had furnished him with forms for this purpose. There was no error in finding that the company had waived its policy requirement of proof of loss.

The trial court awarded plaintiffs $5,000 attorneys' fees. Defendant contends that it was error to allow any attorneys' fees, and that in any event the amount was excessive.

■ The argument that none should have been allowed is based upon ORS 743.114 (1):

"If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of

person claiming to have a loss under an insurance policy issued by such insurer, forms of proof of loss for completion by such person * * *.

"(2) With respect to fire insurance, an insured shall have 90 days after receipt of proof of loss forms to furnish proof of loss, notwithstanding anything more restrictive contained in the policy."

any tender made by the defendant in such action, then the plaintiff shall recover as part of his judgment such additional sum as the court may adjudge to be reasonable as attorney fees."

By its terms this statute allows recovery of attorneys' fees only if no settlement is made within six months of the date of filing proof of loss. Since no proof of loss was filed, it is argued, the requirements of the statute are not met. This position is made untenable by our holding that the trial court could properly find a waiver of the proof of loss requirement. *Eaid v. National Casualty Co.*, 122 Or 547, 259 P 902 (1927).

The statute directs that plaintiff recover as attorneys' fees "such additional sum as the court may adjudge to be reasonable". The amount constituting a reasonable attorney fee is "a question of fact to be determined by the trier of fact upon pleading and evidence in the same manner as any other question of fact." *Parker v. S.I.A.C.*, 242 Or 78, 81, 408 P2d 94 (1965); *State High. Com. et al v. Kendrick et al*, 227 Or 608, 610, 363 P2d 1078 (1961). This means that on appeal the trial court's findings can be set aside only if they are not supported by any substantial competent evidence. Defendant does not argue that there is no such support in the evidence, but urges us to make our own finding of a reasonable amount. On remand the trial court should consider anew the award for attorneys' fees when it modifies its judgment as to the amount of recovery. The amount to be awarded must be determined by the trial court.

Reversed and remanded for modification of judgment in accordance with this opinion.