Christopher **TRUESDELL**, Chris Ann **Truesdell**, and Lakeside State Bank, Plaintiffs,

v.

**STATE FARM FIRE AND CASUALTY COMPANY, Defendant.**

**No. 96–C–648–K.**

United States District Court, N.D. Oklahoma.

April 8, 1997.

David Sanders, Sr., Sanders & Sanders, Tulsa, for Plaintiffs.

Kent Bolling Rainey, Neal E. Stauffer, Richard L. Hathcoat, Stauffer Rainey Gudgel & Harmon, Tulsa, for Defendant.

### ORDER

KERN, Chief Judge.

Before the Court are several motions submitted by the various parties to this cause of action; specifically, the Court will address Demand of Plaintiffs' for Jury Trial (docket # 15), Defendant's Motion for Summary Judgment as to All of the Plaintiffs' Claims or in the Alternative Motion for Summary Judgment as to Plaintiffs' Claims of Bad Faith and Punitive Damages (docket # 8), and Plaintiffs' Motion for Partial Summary Judgment, or in the Alternative, to Enter an Order In Limine (docket # s 36 & 37).

### Parties' Motions for Summary Judgment

#### I. Statement of Facts

This dispute arises out of the Defendant State Farm Fire and Casualty's ("State Farm") alleged breach of an insurance contract. Plaintiffs Christopher and Chris Ann Truesdell ("the Truesdells") are the named insureds on State Farm Homeowner's Policy of Insurance, Policy No. 36–37–5481–1, which provided replacement cost property insurance for the Truesdell's residence located at 140 South Pecan Street in Nowata, Oklahoma. Plaintiff Lakeside State Bank ("Lakeside") is the named mortgagee on the insurance policy. On February 3, 1996, a fire damaged the residence of the Truesdells, rendering it uninhabitable. The Truesdells promptly reported their loss to State Farm, and State Farm agent Jeff West began investigating the loss. On February 14, 1996, an estimate of $60,837.30 for repair of the Truesdell home was submitted by Paul Davis Systems of Tulsa, Inc. ("PDS"). That same day Jeff West completed his own estimate of the repair cost totaling $46,469.05. On February 15, 1996, J & H Construction ("J & H") submitted an estimate of $45,747.38.

On February 29, 1996, State Farm issued a draft in the amount of $31,199.15 payable to both the Truesdells and Lakeside. This amount reflected State Farm's determination of the actual cash value of the Pecan Street residence minus roof depreciation, the insurance deductible, and overhead and profit costs to be paid to the contractor assuming the repairs. This payment was made pursuant to the terms of the insurance policy, which states in applicable part:

### OPTIONAL POLICY PROVISIONS

**Option RC—Replacement Cost—Contents.**

**SECTION I CONDITIONS, 3. Loss Settlement** is replaced with the following:

c. We will pay the cost to repair or replace buildings under Coverage A, subject to the following:

(1) until actual repair or replacement is completed, we will pay the actual cash value of the damage to the buildings, up

to the policy limit, not to exceed the replacement cost of the damaged part of the buildings for equivalent construction and use on the same premises;

(2) you must make claim within 180 days after the loss for any additional payment on a replacement cost basis.

Any additional payment is limited to the amount you actually and necessarily spend to repair or replace the damaged buildings with equivalent construction and for equivalent use on the same premises;

**12. Mortgage Clause.** The word "mortgage" includes trustee:

 a. If a mortgagee is named in this policy, any loss payable under Coverage A shall be paid to the mortgagee and you, as interests appear.

 b. If we deny your claim, that denial shall not apply to a valid claim of the mortgagee, if the mortgagee:

 (1) notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware:

 (2) pays any premium due under this policy on demand if you have neglected to pay the premium; or

 (3) submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

On March 22, 1996 the draft submitted by State Farm was returned by Plaintiff Lakeside along with a letter stating that it was being returned because the amount tendered would not enable the Truesdells to repair their residence. The draft was resubmitted and rejected several times thereafter, and the Truesdells and State Farm continued to negotiate regarding the proper estimate for repair until the Plaintiffs filed their Petition on June 27, 1996. Although the parties dispute the relevance, it is undisputed that the Truesdells never repaired or replaced the Pecan Street residence, and that the home was sold on May 10, 1996.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if "there is no genuine issue as to any material fact and. the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c). The Court must view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986). Where the nonmoving party will bear the burden of proof at trial, that party must "go beyond the pleadings" and identify specific facts which demonstrate the existence of an issue to be tried by the jury. *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992).

## III. *Discussion*

Since Defendant's and Plaintiffs' motions involve the same issues, they will be addressed simultaneously.[1] It appears that several issues of law need to be addressed initially including (1) whether a clause in an insurance contract allowing the insurer to pay actual cash value at the time of loss and reserving replacement value payment until repairs or replacements have taken place is unconscionable or void as a matter of public policy in Oklahoma; (2) Lakeside's legal rights under the contract of insurance; (3) the impact of the sale of the Pecan Street residence on Plaintiffs' claims; and (4) the relevant date for assessing Plaintiffs' allegations of bad faith. After addressing these questions, which are clearly resolvable as a matter of law, the Court will then consider whether genuine issues of fact exist as to each of the Plaintiffs' claims.

1. Although the Court recognizes that Plaintiffs' Motions for Partial Summary Judgment addresses many issues which were pending before the Court as a result of the Defendant's earlier filed Motion for Summary Judgment, the Court denies Defendant's Motion to Strike pursuant to N.D. LR 7.2 D & E, and will consider all information submitted by the parties regarding these disputed issues.

## A. Enforceability of the Replacement Clause

■ Plaintiffs' contend that the clause in the insurance contract which allows State Farm to withhold replacement value until repairs or replacement has been completed is unconscionable, and violates Oklahoma public policy. Plaintiffs' cite *Coblentz v. Oklahoma Farm Bureau Mut. Ins. Co.*, 915 P.2d 938 (Okla.App.1995), in support of their argument. In *Coblentz*, the plaintiffs' home, which was insured by replacement cost insurance, was damaged by a tornado. The replacement cost endorsement stated that the insurer would pay the actual cost of repair or replacement, but only if the plaintiffs actually repaired or replaced the property. When the plaintiffs filed a claim with the insurance company, the insurance company paid the actual cash value of the damaged property, but refused to pay for the replacement or repair costs until the plaintiffs actually repaired or replaced the property. Plaintiffs were unable to repair or replace their damaged property because they did not have the money to do so. The Oklahoma Court of Appeals held that where an insured paid an enhanced premium for a replacement value insurance policy, the insurance company could not pay actual cash value and withhold replacement value until repairs or replacement had taken place. The court declared such a condition precedent was unconscionable, and violated Oklahoma public policy as it placed the insureds "who lacked the financial wherewithal to replace the property, in a legal-'Catch 22.' "

State Farm asserts that the *Coblentz* opinion is not the law of Oklahoma since it is only an Oklahoma Court of Appeals case, and that the opinion is contrary to the findings of other courts addressing the same issue.

■ A federal court sitting in diversity, must ascertain and apply Oklahoma law with the objective that the result obtained in federal court would be the result obtained in state court. *Perlmutter v. United States Gypsum Co.*, 4 F.3d 864, 869 (10th Cir.1993). Federal courts are obliged to follow the rulings of the state's highest court, but are not bound by intermediate appellate decisions to the extent that federal courts are bound to determine state law as it believes the state high court would. *Id.;* 19 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 4507 at 157 (2d ed.1996). Intermediate court decisions have been regarded by the Tenth Circuit as indicia of the leanings of the state's highest court and have followed suit "unless other authority convinces [us] that the state supreme court would decide otherwise." *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1543 (10th Cir.1992) *quoting Delano v. Kitch*, 663 F.2d 990, 996 (10th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *Jordan v. Shattuck Nat. Bank*, 868 F.2d 383, 386 (10th Cir.1989).

In support of their contention that the Oklahoma Supreme Court would follow the *Coblentz* decision, Plaintiffs indicate that, after the Court of Appeals rendered its decision, the insurance company petitioned the Oklahoma Supreme Court for *certiorari*, which was denied. Subsequently, the insurance company and other companies petitioned the Oklahoma Supreme Court, requesting that the court order that the *Coblentz* opinion not be published. The Oklahoma Supreme Court denied the insurance company's petition, and the *Coblentz* opinion was released for publication shortly thereafter. Plaintiffs assert that these actions constitute an inferred blessing or endorsement of the *Coblentz* opinion by the Oklahoma Supreme Court.

Defendants contend that the Oklahoma Supreme Court would not follow the *Coblentz* decision for two reasons: (1) the holding is contrary to that of all other courts and learned treatises addressing the issue of replacement value provisions; and (2) the holding is contrary to prior Oklahoma Supreme Court precedent enforcing insurance contracts where the terms are unambiguous, clear and consistent, *citing Phillips v. Estate of Greenfield*, 859 P.2d 1101, 1104 (Okla. 1993). Defendant's further maintain that the policy provision is not unconscionable as it addresses two of the primary goals of insurance: indemnity and protection against moral hazard. State Farm insists that the purpose of insurance is to make the insured whole, but not to benefit him. State Farm

argues that, although deterioration of property is an insurable risk under replacement coverage, allowing an insured to recover replacement costs without requiring actual replacement or repair would permit an insured to profit from a loss, and would thus encourage moral hazard. State Farm propounds that insurers will act fairly in adjudicating these claims, because they remain subject to the duty to act fairly and in good faith.

The Court finds that, the *Coblentz* decision aside, this issue is one of first impression in Oklahoma. When faced with an issue of first impression regarding interpretation of an insurance contract, the Oklahoma Supreme Court has looked to decisions rendered in other states, and if the various holdings conflict, the Court follows those cases utilizing the most persuasive reasoning. *See e.g., Phillips v. Estate of Greenfield,* 859 P.2d 1101, 1104–04 (Okla.1993). The Supreme Court also looks to its own holdings in analogous cases. *See e.g., Pentz v. Davis,* 927 P.2d 538, 541 (Okla.1996).

It is undeniable that, under Oklahoma law, an insurance contract which is unambiguous, clear and consistent, is to be accepted in its ordinary sense and enforced to carry out the intentions of the parties. *Phillips,* 859 P.2d at 1104. Additionally, the Oklahoma Supreme Court has held that "parties to an insurance contract are at liberty to contract for insurance to cover such risks as they see fit and are bound by the terms of the contract and courts will not undertake to rewrite the terms thereof." *Id.* The Oklahoma Supreme Court has defined unconscionability in the context of a commercial transaction as follows:

[A]n unconscionable contract is one in which no person in his senses, not under delusion would make, on the one hand, and which no fair and honest man would accept on the other. The basic test of unconscionability of a contract is whether under the circumstances existing at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties. Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other party.

*Barnes v. Helfenbein,* 548 P.2d 1014, 1020 (Okla.1976). The Supreme Court; however, limited the applicability of *Barnes* to situations involving onerous inequality, deception and oppression. "Unconscionability is directly related to fraud and deceit." *Id.*

With these standards in mind, the Court looks to other jurisdictions which have addressed the issue of the enforceability of replacement cost clauses. Uniformly, and without exception, these cases have held that such terms are enforceable as long as they are clear and unambiguous. *See e.g., Dickler v. CIGNA Property & Cas. Co.,* 957 F.2d 1088 (3rd Cir.1992); *Lerer Realty Corp. v. MFB Mut. Ins. Co.,* 474 F.2d 410 (5th Cir. 1973); *O–So Detroit, Inc. v. Home Ins. Co.,* 973 F.2d 498 (6th Cir.1992); *Bourazak v. North River Ins. Co.,* 379 F.2d 530 (7th Cir.1967); *Kolls v. Aetna Cas. & Surety Co.,* 503 F.2d 569 (8th Cir.1974); *Maryland Cas. Co. v. Knight,* 96 F.3d 1284 (9th Cir.1996); *Snellen v. State Farm Fire & Cas. Co.,* 675 F.Supp. 1064 (W.D.Ky.1987); *Hilley v. Allstate Ins. Co.,* 562 So.2d 184 (Ala.1990); *Smith v. Michigan Basic Property Ins. Assn.,* 441 Mich. 181, 490 N.W.2d 864 (1992); *Higgins v. Ins. Co. of North America,* 256 Or. 151, 469 P.2d 766 (1970); *Whitmer v. Graphic Arts Mut. Ins. Co.,* 242 Va. 349, 410 S.E.2d 642 (1991); *Hess v. North Pacific Ins. Co.,* 122 Wash.2d 180, 859 P.2d 586 (1993). The *Hess* case is of particular significance because it is a recent case specifically noting the "substantial line of authorities" establishing the validity of replacement cost clauses similar or identical to the clause at issue in this case. *Hess v. North Pacific Ins. Co.,* 122 Wash.2d 180, 859 P.2d 586, 589–91 (1993). Although admittedly the above cases did not address the specific issue of unconscionability, it is clear that the great weight of authority has upheld the validity of replacement cost insurance clauses identical or substantially similar to the clause at issue in this case.

The *Coblentz* court found the replacement cost clause in the insurance contract at issue

in that case met the definition of unconscionability under *Barnes* for two reasons: (1) because all insurance contracts are contracts of adhesion, which necessarily indicate a weaker party's lack of choice as to the language of the policy; and (2) because the clause as applied resulted in a "Catch–22" for the insured. The insured could not afford to replace personal property lost in a tornado, the actual cash value did not cover replacement cost, and the insured had paid a higher premium for replacement cost insurance. The *Coblentz* court also emphasized that the policy in question there would force the plaintiffs to expend replacement funds without any assurance that they would be reimbursed.

This Court holds that the Oklahoma Supreme Court would not find replacement cost clauses unconscionable as a matter of law, and would limit the *Coblentz* decision to its facts, if it upheld the decision at all.[2] The current case is distinguishable from *Coblentz* for several reasons. The test of unconscionability as stated in *Barnes* simply does not apply to this case. There is no evidence of fraud or deceit, and the contract, as applied, was not unreasonably favorable to State Farm. The language of the replacement cost endorsement was clear and unambiguous, and indicated that replacement cost would not be paid until actual repairs or replacement occurred. The Truesdells made a conscious choice to pay an additional premium for the replacement cost endorsement which clearly stated that replacement costs would not be paid unless repairs were made. Additionally, once the Plaintiffs informed State Farm that the actual cash value tendered would not be sufficient to replace the residence, State Farm agreed to go beyond the actual language of the policy and provide replacement cost once the Truesdells signed a binding contract with a contractor to do the repairs.[3] Clearly the replacement cost clause, as applied in this case, did not put the insureds in a "Catch–22". State Farm went beyond the strict language of the policy pursuant to its obligation to act in good faith. State Farm's payment of actual cash value to the Truesdells would have allowed them to begin the rebuilding process, and State Farm was willing to pay the replacement cost once the Truesdells provided good faith evidence that they intended to complete the repairs to the home. The Truesdells did not face the risk of non-reimbursement that concerned the *Coblentz* court. State Farm agreed to pay the repair cost *up front*, once the Truesdells presented a signed contract from a contractor. The Truesdells were limited to actual cash value for the property solely as a result of their own failure to even consider initiating the repair process by retaining a contractor.

Allowing the insured to recover replacement cost with no intention of replacing or repairing the damaged property would disregard the risk limiting nature of insurance contracts. The replacement cost clause at issue here is clear and unambiguous. The insurer, pursuant to its obligation to act fairly and in good faith, agreed to pay replacement cost upon receiving adequate assurance that the insureds did indeed intend to repair or replace the residence. The Court holds, that as a matter of Oklahoma law, the clause in the insurance policy allowing the insurance company to withhold replacement cost until actual repairs or replacements are made is not unconscionable as applied in this instance, and does not violate the public policy of Oklahoma.

### B. Lakeside's Rights as Named Mortgagee in the Insurance Contract

■ According to Lakeside, when a mortgagee is named in a contract of insurance,

---

2. The Court believes that the Oklahoma Supreme Court might overturn the *Coblentz* decision because it improperly applied the concept of unconscionability as stated by the Oklahoma Supreme Court in *Barnes v. Helfenbein*, 548 P.2d 1014 (Okla.1976). Although insurance contracts generally are considered adhesion contracts, the *Coblentz* plaintiffs had a choice whether to pay an additional premium for the replacement cost endorsement as it was written.

3. Plaintiffs have requested that the actions of State Farm after February 29, 1996, be excluded as irrelevant for purposes of determining Plaintiffs bad faith claims. The Court addresses that issue *infra*, but holds that State Farm's post-February 29, 1996 actions are relevant to the determination of the unconscionability issue.

# 1518

the mortgagee has a contract with the insurance company which is separate and distinct from the, contract between the insurance company and the insured, *citing Oklahoma State Union of Farmers' Ed. & Coop. Union v. Folsom,* 325 P.2d 1053 (Okla.1958). Lakeside contends that, under this theory of law, the mortgagee is entitled to the proceeds of the policy to the extent of the mortgage debt, and this claim cannot be defeated by any acts of the insured. *Savings Building & Loan Assn. v. Seaman–Packard Lumber Co.,* 170 Okla. 331, 40 P.2d 660 (1935); *First State Bank of Idabel, Oklahoma v. State Farm Fire & Cas. Co.,* 840 P.2d 1267 (Okla.App. 1992); *Puckett v. Southeast Plaza Bank,* 620 P.2d 461 (Okla.App.1980).

State Farm asserts that its duty to the mortgagee in this case was met by writing a check jointly payable to both the insureds and to Lakeside, and that it had no duty to adjust the losses under the policy with Lakeside. Additionally, State Farm claims that any amount owed to Lakeside should be reduced by the amount of the mortgage which was settled by the subsequent sale of the property in question.

▉ It is clear that under Oklahoma law, the policy language relating to the mortgagee in this case is a standard mortgage clause. *Wilson v. Glancy,* 913 P.2d 286, 289 (Okla.1995). It is equally apparent that a standard mortgage clause creates a separate contract of insurance with a mortgagee which cannot be defeated by the acts of the insured. *Oklahoma State Union of Farmers' Educ. & Coop. Union of America v. Folsom,* 325 P.2d 1053, 1056 (Okla.1958). However, this means that the mortgagee is protected against any misconduct or negligence on the part of the insured which might result in the insured being denied coverage. In other words, Lakeside has a separate policy of insurance to the extent that if the insured's claim is denied, such denial is not binding on Lakeside's interests under the policy.

Under the clear language of the policy, Lakeside is entitled to joint payment of the actual cash value. The Truesdells were entitled to use those funds to repair or replace the residence only if Lakeside agreed to such use. By making the check payable to both

the Truesdells and Lakeside, State Farm protected Lakeside's interests under the insurance contract. Since it is undisputed that the Pecan Street residence has been sold, it necessarily follows that the insurance proceeds will not be used to repair or replace the dwelling. For this reason, Lakeside is entitled to the insurance proceeds to the extent of any debt remaining on the mortgage. Lakeside's Motion for Partial Summary Judgment as to this issue is GRANTED to the extent that Lakeside does have a separate contract of insurance; however its recovery will be limited. *See discussion infra.*

## C. *Effect of Sale of Residence on Lakeside's Claims*

State Farm argues that any claim which Lakeside has to the proceeds of the insurance policy must be limited to the amount of the loan still outstanding upon resolution of this dispute. It submits that failure to account for the sale of the property and the resulting discharge of part of the mortgage would result in unjust enrichment to Lakeside. Lakeside maintains that any events which occurred after February 29, 1996 are irrelevant, and that it is entitled to the amount of the mortgage which was outstanding at the time of the fire.

▉ A mortgagee's insurable interest is limited to the amount of the debt owed, and that amount can be reduced according to any subsequent reduction in the debt amount. *Conner v. Northwestern National Cas. Co.,* 774 P.2d 1055, 1057 (Okla.1989). Thus, assuming Lakeside did not agree to allow the Truesdells to repair or replace their residence, Lakeside would be entitled to any amount due and owing on the outstanding mortgage. Lakeside will not be entitled to recovery of the debt amount as of the day of the fire, as that would defeat the indemnity purposes of insurance, and result in double recovery. The case of *First State Bank of Idabel, Oklahoma v. State Farm Fire & Cas. Co.;* 840 P.2d 1267 (Okla.App.1992) supports this conclusion. In that case, the court held that the mortgagee bank was entitled to payment of the insurance proceeds pursuant to the mortgage clause in the insurance policy

because the insurance company, in violation of its own policy provisions, paid $17,482.97 to the insured for repairs to buildings and for replacement of personal items without consulting the bank, or naming the bank as joint payee on the settlement drafts. The Court held that any double payment was the result of the insurance company's own failure to follow the policy provisions. In this case, the insurance company did follow the clear and unambiguous terms of the policy, and made the initial actual cash value draft payable to both the Truesdells and Lakeside. Lakeside's interests in the insurance proceeds were thus fully protected, and it was in a position to negotiate with the insured at that point as to whether the draft would be applied toward repair and replacement of the property, or whether it would be applied to the outstanding mortgage.

Similarly, this case is distinguishable from *Wilson v. Glancy*, 913 P.2d 286 (Okla.1995). In *Wilson*, the court held that a second mortgagee who purchased the mortgaged property at a sheriffs sale was entitled to the proceeds of the insurance policy after the property was destroyed by fire. The mortgagee had made a bid in the amount of the outstanding debt, but the fire occurred before title to the property had been transferred. The Court's decision was based upon the fact that the mortgagee retained an insurable interest since the mortgagor retained his right of redemption until such time as the title was transferred. In this case, Lakeside's insurable interest extinguished with the sale of the property, at least as to the amount of the debt that was repaid.

Allowing Lakeside to recover under the policy would result in double recovery, which is not favored under insurance law or the law of Oklahoma. The Oklahoma Supreme Court has spoken indirectly about the issue of double recovery. In *Folsom, supra,* the Oklahoma Supreme Court was addressing, among other things, the issue of whether or not the named mortgagee in an insurance policy should be joined as a party to the action. The Court held that the only purpose to naming the mortgagee as a party to the action would be to prevent double recovery, which would be avoided because the insured

stipulated that any amount recovered would be paid to the mortgagee.

For the foregoing reasons, Lakeside's Motion for Partial Summary Judgment is DENIED as to its claim that it is entitled to the amount of the debt existing on the date of loss.

**D. Relevant Date for Determining Bad Faith Issues**

■ Plaintiffs submit that the issue of whether or not State Farm acted in bad faith should be determined solely by consideration of State Farm's actions prior to February 29, 1996, *citing Buzzard v. Farmers Ins. Co.,* 824 P.2d 1105 (Okla.1991). State Farm asserts that the *Buzzard* case is inapplicable because State Farm never denied Plaintiffs' claims, and the parties continued to engage in negotiation of the claim through June, 1996.

Although State Farm did not deny Plaintiffs' claims, on February 29, 1996, State Farm did submit an offer by which it indicated what it had determined to be actual cash value for the property as well as the cost of repair. Plaintiffs insist that any actions taken by State Farm after that date, such as seeking other estimates, are irrelevant to the bad faith claim as the bad faith claim is now limited to the issue of whether or not State Farm acted unreasonably in calculating the actual cash value of the Truesdell's residence. The Court agrees, and hold that the bad faith claims against State Farm will be litigated based solely on the reasonableness of State Farm's actions prior to February 29, 1996.

**E. Questions of Fact Precluding Summary Judgment**

**1. Breach of Contract Claim**

■ State Farm propounds that there is no genuine issue of material fact regarding Plaintiffs' breach of contract claim since it is undisputed that State Farm followed the policy provisions of the contract, tendered an actual cash value amount that was reasonable in light of the available estimates, and no repairs have been undertaken entitling Plaintiffs to a greater amount.

The Truesdells assert that a genuine issue of fact exists as to whether State Farm's

calculations of the repair costs and the actual cash value of the Pecan Street residence were reasonable. The Court agrees that these are disputed issues, and that reasonable minds could disagree as to the result. For this reason, summary judgment as to the breach of contract claim is DENIED.

## 2. Bad Faith and Punitive Damages

 Since the Court has determined that the replacement cost clause as applied in this case was not unconscionable, any bad faith claims based on State Farm's failure to pay replacement cost at the time of loss are resolved in State Farm's favor as a matter of law. The only remaining bad faith issues involve State Farm's calculation of the actual cash value and replacement costs, and whether State Farm's initial tender was made in a timely fashion. State Farm maintains that it acted in good faith in calculating the actual cash value and repair estimates on the Pecan Street residence. State Farm further contends that there is no evidence of fraud, malice or oppression in support of a claim for punitive damages.

 Under Oklahoma law, an insurer has an implied to duty to deal fairly and act in good faith with its insured. *Timberlake Constr. Co. v. United States Fidelity & Guar. Co.*, 71 F.3d 335, 343 (1995). In determining a motion for summary judgment, a court has the obligation to determine whether the insurer's conduct may be reasonably perceived as tortious. *Willis v. Midland Risk Ins. Co.*, 42 F.3d 607, 612 (10th Cir. 1994). The Oklahoma court which first recognized the tort of insurance bad faith indicated that not all decisions adverse to an insured would result in a bad faith claim. "We recognize that there can be disagreements between insurer and insured on a variety of matters such as the insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions ..." *Christian v. American Home Assur. Co.*, 577 P.2d 899, 905 (Okla.1978). The court

further stated that tort liability could be imposed only where there is a clear showing that the insurer acts unreasonably, and in bad faith. Later courts have interpreted this to mean that where there is a genuine dispute, and the insurer acts in a reasonable and legitimate manner, there can be no bad faith. *See e.g., Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir.1993).

State Farm has presented evidence that its calculations were well within the range of several estimates submitted to it prior to the tender of the draft to the Plaintiffs. Additionally, tender of the actual cash value was made to the Plaintiffs within 26 days of the date of loss. Plaintiffs claim that the estimates considered by State Farm were inadequate, were based on estimates made by an disreputable and incompetent contractor, and did not take into account repair of wood trim in the living room, *safe* repair to the electrical system, and replacement of redwood siding. Plaintiffs further contend that State Farms calculation was made in bad faith as it did not consider contractors' profit and overhead, and deducted for roof depreciation.

State Farm has presented rebuttal evidence that it did consider replacement of wood trim, repair to the electrical system, and replacement of the redwood siding with a *like* material.[4] It further contends that the contractor's overhead and profit was omitted from the actual cash value calculation because such costs would not be incurred until after the repairs had been made. Similarly; roof depreciation was excluded pursuant to an explicit policy provision.

It appears that there is a genuine dispute as to the proper cost of repair and/or replacement of the dwelling; however, as long as State Farm acted in a reasonable manner, no claim for bad faith can be pursued. Three estimates were obtained before State Farm submitted an offer of payment to the Plaintiffs. The first estimate was $60,837.30, the second was $46,469.05, and the third was

---

4. The parties dispute the proper way to repair the electrical system. Plaintiffs contend that the entire wiring needed to be replaced. State Farm insists that it is sufficient to replace the damaged wire, and splice the new wire into the existing wire. The parties further argue the replacement of the siding. Truesdells indicate that redwood siding is far superior than the pine siding suggested by State Farm. State Farm submits that Mr. Truesdell is not qualified to give an opinion regarding the quality of different types of wood siding.

$45,747.38. State Farm's offer of payment was based upon the second highest of the three bids it received, and was made within 26 days of the date of loss. The only other estimates submitted to the Court by the Plaintiffs were $60,000 by Joe Wright, and $65,500 by Jerry Yirsa; neither of these estimates, as compared to the three estimates submitted by the Defendant, were detailed, specific, or supported by documentary evidence, and State Farm contends that they are inadmissible hearsay.

Questions of reasonableness are generally factual issues, and the Court cannot hold as a matter of law that State Farm acted in an reasonable manner by rejecting the highest of the three estimates it received in light of Plaintiffs' explanation as to why the bids differed to such a large extent. Therefore State Farm's Motion for Partial Summary Judgment as to Plaintiffs' Bad Faith and Punitive Damages claims is DENIED as to whether or not State Farm acted reasonably in calculating the actual cash value and repair costs.

■ As to the Plaintiffs' lack of timeliness claim, it is clear that State Farm acted reasonably in terms of the amount of time it took to submit its initial offer to the Plaintiffs. State Farm received notice of the loss on February 3, 1996. State Farm received the initial bid for repairs on February 14, and completed its own investigation and estimate that same day. The next day, State Farm received the third estimate for repairs. On February 28, 1996, Jeff West, State Farm's claim specialist, requested and received permission from State Farm to pay $48,395.72 for the losses incurred on the dwelling, and he issued a draft to the Plaintiffs the next day. The Plaintiffs have not alleged any willful delay in this process, and the Court finds that State Farm issued the draft timely as a matter of law. State Farm's Motion for Partial Summary Judgment as to Plaintiffs' Claims for Bad Faith and Punitive Damages is GRANTED as to the issue of whether timely payment was made.

■ Although the Court finds that issues of fact exist precluding summary judgment on Plaintiffs' bad faith claims, Plaintiffs have failed to present any evidence supporting a claim for punitive damages. For this reason, State Farm's Motion for Partial Summary Judgment as to Plaintiffs' Punitive Damages Claim is GRANTED.

### Plaintiffs' Demand for Jury Trial

■ Plaintiffs assert that, under Oklahoma law, they are entitled to a jury trial unless they expressly waive that right. Plaintiffs further contend that under *Fed. R. Civ. Pro.* 81(c), because the Defendant has not requested nor has the Court specifically ordered Plaintiffs to file a demand for a jury, their request at this time is timely. Defendant correctly points out that under N.D. LR 81.2, a demand for jury trial, if desired by parties to any case removed from state court, must be made within thirty days of the notice of removal or trial by jury is waived.

■ Despite Plaintiffs' untimely request for a jury trial, a court has broad discretion, pursuant to *Fed R Civ. Pro.* 39(b), to order a jury trial of any or all issues upon motion by a party. *Federal Deposit Ins. Corp. v. Palermo*, 815 F.2d 1329, 1333 (10th Cir.1987); *Paramount Pictures Corp. v. Thompson Theatres, Inc.*, 621 F.2d 1088, 1090 (10th Cir.1980). Although cases have held that the right to a jury trial can be waived due to an untimely request caused by mere inadvertence or mistake, *see e.g., Nissan Motor Corp. v. Burciaga*, 982 F.2d 408, 409 (10th Cir.1992), waiver of a constitutional right should not be made lightly. The Tenth Circuit has held that, absent strong and compelling reasons to the contrary, a district court should exercise its discretion under Rule 39(b) and grant a jury trial. *Burciaga*, 982 F.2d at 409 *citing AMF Tuboscope, Inc. v. Cunningham*, 352 F.2d 150, 155 (10th Cir. 1965). When a request for a jury trial is made in a manner sufficient to bring it to the attention of the court and the other parties, the failure to file a timely demand should not be deemed fatal. Plaintiffs first made known their desire for a jury trial in the case management conference held many months prior to trial, and at the earliest stages of discovery. The Court finds that the Defendant was given adequate notice of the potential for

**1522**

a jury trial, and has failed to state any reason why a jury trial should not be granted. For the foregoing reasons, the Court will exercise its discretion pursuant to *Fed. R. Civ. Pro.* 39(b), and will grant Plaintiffs' Demand for Jury Trial.

### IV. *Conclusion*

Plaintiffs Demand for a Jury Trial (docket # 15) is GRANTED. Defendant's Motion for Summary Judgment as to All Claims (docket # 8) is DENIED. Defendant's Motion for Summary Judgment as to Plaintiffs' Claims of Bad Faith and Punitive Damages (docket # 8) is GRANTED in part and DENIED in part. Plaintiff Lakeside State Bank's Motion for Partial Summary Judgment (docket # 36) is GRANTED in part, and DENIED in part. Plaintiff Lakeside State Bank's Motion to Enter an Order in Limine (docket # 36) is GRANTED. Plaintiffs Christopher and Chris Ann Truesdell's Motion for Partial Summary Judgment (docket # 37) is DENIED. Plaintiffs Christopher and Chris Ann Truesdell's Motion for an Order in Limine (docket # 37) is GRANTED. Defendant's Motion to Strike Plaintiffs' Motions for Partial Summary Judgment and Motion in Limine (docket # 40) is DENIED.