242 P.3d 624 (2010)
238 Or. App. 101
Lowell E. PATTON, Plaintiff-Respondent, Cross-Appellant,
v.
MUTUAL OF ENUMCLAW INSURANCE COMPANY, a Washington corporation, Defendant-Appellant, Cross-Respondent, and
Hopp Insurance Agency, Inc., an Oregon corporation; and Randy W. Hopp, Defendants-Cross-Respondents.
03-11-12054; A134159.
Court of Appeals of Oregon.
Argued and Submitted September 18, 2009.
Decided October 20, 2010.
*625 Thomas M. Christ, Portland, argued the cause for appellantcross-respondent. With him on the briefs were Julie A. Smith and Cosgrave Vergeer Kester LLP.
Robert K. Udziela, Portland, argued the cause and filed the briefs for respondent cross-appellant.
George S. Pitcher, Portland, argued the cause for defendantscross-respondents. With him on the brief was Rachel A. Robinson.
Before LANDAU, Presiding Judge, and SCHUMAN, Judge, and ORTEGA, Judge.
ORTEGA, J.
Plaintiff's house was insured against fire under a policy issued by defendant Mutual of Enumclaw Insurance Company (MOE). The house burned down, and plaintiff filed a claim under the policy. He later brought this action against MOE and its agent, Hopp Insurance Agency,[1] seeking declaratory relief and damages for breach of contract and negligence. The trial court directed a verdict for plaintiff on the breach of contract claim and directed verdicts for MOE and Hopp on the negligence claims. MOE appeals, seeking *626 reversal of the judgment for plaintiff on the breach of contract claim. Plaintiff cross-appeals, challenging the trial court's judgment for Hopp on the negligence claim. On MOE's appeal, we reverse and remand for a new trial on the breach of contract claim; we affirm on the cross-appeal.
For purposes of the issues raised on appeal, the relevant facts are largely undisputed. We recount them in some detail, including the relevant policy provisions and defendants' communications to plaintiff regarding those provisions, because the detail of those communications is necessary to evaluate the contract and negligence claims at issue in this appeal.
Plaintiff purchased a MOE homeowner insurance policy through Hopp. When plaintiff began an extensive remodel and addition to his home, he called Hopp and requested an increase in his basic coverage. Hopp increased plaintiff's basic coverage to $600,000, which was the maximum dwelling coverage that MOE could offer on homes. The declarations page showed a limit of $600,000 for the dwelling.
Plaintiff's policy also provided coverage for loss of use and for damage to personal property. The policy defined "loss of use" as "fair rental value" of the destroyed premises. The loss of use benefit was limited to a percentage of the amount of insurance on the structure as shown on the declarations page. In light of the $600,000 limit on the dwelling as shown on the declarations page, plaintiff's maximum "loss of use" benefit was $120,000. The policy limit for loss of personal property was $420,000.
Plaintiff's policy also included an endorsement for "guaranteed replacement cost." Under that endorsement, in the event of loss, as an alternative to payment of the liability limit of $600,000 stated on the declarations page, MOE agreed to pay
"not more than the lesser of:
"1. The replacement cost of that part of the building damaged for like construction and use on the same premises; or
"2. The necessary amount required to repair or replace the damaged building."
Among the conditions for receiving the replacement cost coverage, the policy required plaintiff to "[i]nsure the dwelling and other structures to 100% of replacement cost as of the date this endorsement becomes effective," and to "[n]otify [MOE] within 90 days of the start of any additions or physical changes that increase the value of the dwelling or other structures on the resident premises by $5,000 or more[.]"
The policy explained how covered losses were to be settled:
"(4) We will pay no more than the actual cash value of the damage unless:
"(a) actual repair or replacement is complete; or
"(b) the cost to repair or replace the damage is both:
"(i) less than 5% of the amount of insurance in this policy on the building; and
"(ii) less than $2,500.
"(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for additional liability on a replacement cost basis."
An additional endorsement provided that "[n]o action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss."
On November 8, 2001, shortly before completion of the addition, the house was destroyed by fire, and plaintiff made a claim under the policy. Plaintiff notified MOE that he intended to take advantage of the policy's replacement-cost endorsement and that he was considering rebuilding. The addition to the home had been quite extensive and had included antique woods that were no longer available. Plaintiff obtained an estimate from Custer Construction indicating that the cost to replace the home would be between $3.6 and $4 million. Plaintiff obtained a second estimate of $3.858 million.
Plaintiff had trouble obtaining the necessary approval for reconstruction from the City of Lake Oswego. Plaintiff notified *627 MOE of those problems, and its adjuster, Gene Chandlee, reminded plaintiff that, under the terms of the policy, reconstruction would have to be completed before MOE would pay the full replacement cost. Chandlee also asked plaintiff to seek a more detailed bid from Custer. He also obtained a much lower bid from Oregon Home Improvement Company (OHI) to rebuild for $1.544 million. Plaintiff expressed doubt that the house could be rebuilt for that amount using the same quality of materials and construction.
In September 2002, 10 months after the fire, MOE's attorney, Smith, wrote to plaintiff explaining that OHI's bid was not necessarily the limit of what MOE would pay. Smith explained to plaintiff that, as construction continued, "the amount to replace your home may have to be adjusted upwards or downwards." Smith encouraged plaintiff to provide MOE with more information about the house that had burned, including construction documents for the remodel, explaining that "[t]his will go a long way toward assuring that [the OHI] bid is accurate." Smith told plaintiff that OHI was a well-regarded firm and that it could rebuild the home with like construction and use, as required by the policy. Smith advised that plaintiff was free to choose a different builder, but that, if the costs to rebuild exceeded OHI's bid, "the difference will have to be reconciled or you may be responsible for those additional costs." Smith also advised plaintiff that, under the policy, the limit of MOE's responsibility was "the necessary amount required to repair or replace the damaged building," and that currently the OHI bid was MOE's best estimate of that amount.
In the September letter, Smith also expressed concern that the rebuilding had not yet begun and reminded plaintiff that, under the policy, plaintiff was entitled to replacement cost benefits only on completion of the actual repair or replacement. Smith called "special attention" to provisions of the policy requiring that, in order to recover replacement costs, plaintiff had to complete replacement. Smith further reminded plaintiff of the policy's requirement that plaintiff had until two years from the date of lossthat is, until November 8, 2003within which to resolve any claims against MOE or to bring an action in court. Smith closed the letter with the statement, "All rights under your policy of insurance with [MOE] are reserved. No waiver or estoppel of any kind is intended and none should be implied."
After Smith and plaintiff met in person, Smith wrote to plaintiff again on October 15, memorializing their discussion. Smith encouraged plaintiff to hire "whichever architect you plan to use to rebuild your home. You can build whatever kind of home you want, whether it be bigger and fancier than what you had or smaller and less fancy." Smith also reminded plaintiff that the policy contained conditions for coverage. Smith quoted portions of the policy, including the requirement that MOE would pay
"* * * not more than the lesser of:

"1. the replacement cost of that part of the building damaged for like construction and use on the same premises;

"or
"2. the necessary amount required to repair or replace the damaged building."
(Emphasis in Smith letter.) Smith also quoted the policy's requirement that MOE would not pay more than actual cash value of the destroyed property until completion of replacement or repair, and reminded plaintiff that the replacement cost benefit was only available with the completion of replacement or repairs:
"In other words, you actually have to make the repair or replacement to obtain the benefit of the replacement cost portion of your policy and [MOE] is not obligated to pay you until after repair or replacement is complete. [MOE] realizes that this places a practical problem in your path and the company will make an agreement with you and your builder to make progress payments as construction progresses. Your * * * mortgage companies have already been paid the actual cash value limit of $600,000 and you will need to make arrangements to finance that amount for the reconstruction project. After those funds *628 are committed and paid during the reconstruction, [MOE] will make arrangements to finance the remainder of the reconstruction."
The October letter also stated:
"[MOE] is concerned that you are running out of time if you choose to rebuild your house. In addition to the rental value time limitation, there is also a two-year limitation in your policy for you to bring suit against [MOE] if you feel that the company has breached the policy in any way. As stated in my [September letter], we are concerned that you may lose some of the benefits you are entitled to under your policy if you don't get started on the rebuilding immediately."
The letter concluded with the same statement contained in the September letter concerning the reservation of rights and no waiver or estoppel.
Plaintiff asked Smith for clarification. In a letter of October 29, 2002, Smith explained further:
"1. You may use whatever architect you choose, build whatever kind of home you choose and use whatever kind of materials in the home you choose. That having been said, there are limits under your insurance policy as to what [MOE] will pay for. In my letter to you of October 15, 2002, I cited the provision [of the policy] which sets out [MOE's] payment obligation. In short, the necessary cost to rebuild the home you had of like construction and use sets the limit. At this point, [OHI] has bid $1,670,383.20. As we discussed, we have asked [another contractor] to prepare his own bid, and this will give us another idea of what the necessary cost to replace will be.
"2. You have already received the actual cash value limit of $600,000. This money was applied to your mortgage. In the October 15th letter, I cited the provision [of the policy] that states that the insurance company will pay no more than the actual cash value until actual replacement is complete. The actual cash value payment is the first installment on your replacement cost benefit and [MOE] will work with your builder to make progress payments rather than force you to finance the entire construction project until it is complete. The next installment on your replacement cost benefit is not owed until you have spent the first installment, i.e. the $600,000 already paid.
"3. You should feel free to change the plans of the house so that you get the house you want. Again, [MOE] will pay for what you actually build, limited by like construction and use and the necessary cost to build it.

"4. [The architect's] invoice * * * is part of the replacement cost effort. As stated above, the replacement cost benefits are not available until after the actual cash value benefit already paid has been expended in reconstruction efforts. Perhaps the mortgage company who received that benefit will open up a $600,000 line of credit for you to begin drawing down to begin the reconstruction efforts.
"5. There are time limits in your policy and I want to be sure you are aware of them. I have cited them in my earlier letters to you and they are, essentially, that your fair rental value payments are available only for `* * * the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.' * * * In addition, there is a two-year suit limitation period that runs on the second anniversary of the fire loss. If you feel [MOE] has breached any of the policy provisions, you will be required to file suit on or before November 8, 2003, if you feel you are entitled to more money."
(Emphasis added; except final emphasis in original.) The October 29 letter concluded with the same statement concerning MOE's reservation of rights and no waiver or estoppel.
*629 Plaintiff continued to have problems securing a building permit from the City of Lake Oswego. In February 2003, plaintiff met with Smith and MOE's adjuster, and MOE advanced to plaintiff an additional $1.14 million, which, together with the $600,000 already paid, equaled OHI's bid. In a March letter memorializing the meeting, Smith explained that MOE was "advancing you this additional mon[ey] so that you will be able to get started on building your home, even though the advancement is not required under the terms of your policy." Smith further stated that, if plaintiff did rebuild and it was necessary to spend more money to obtain a home of like construction, MOE would pay "as long as those expenses are necessary and are actually spent." Smith stated, further:
"All other terms and conditions of your insurance policy are not waived, either by you or [MOE]. In particular, we spoke about the two year limitation period to file suit against [MOE] if you feel that insurer has breached its policy with you. * * * Accordingly, if you feel that you must file suit to protect your rights, you must do so before the close of business on Monday, November 10, 2003."
Plaintiff later asked Smith if MOE would agree to extend the two-year period for bringing suit. Smith declined plaintiff's request. On May 27, 2003, Smith again wrote to plaintiff, reminding plaintiff of the terms of MOE's replacement cost coverage and quoting those terms. Smith stated further:
"[MOE] waived the requirement that you construct your house on the property where the fire occurred in order to give you the extra option in getting a new home. The amount available in replacing the home did not change and you have been paid the full amount. [MOE] was not obliged to pay you the full replacement cost until you actually replaced the home but, again, your insurer wanted to give you the money so that you could get started on rebuilding or buying a substitute home. No more money is available to you under Coverage A (the dwelling) unless you rebuild on the same premises and there are increased costs for like construction and use that were not anticipated in the [OHI] bid.
"All of the terms and conditions of your policy remain, including the two-year suit limitation. No waiver or estoppel is intended and none should be implied."
Four months later, plaintiff entered into a construction contract to rebuild the home for an estimated cost of $3.8 million. Just before the second anniversary of the fire, plaintiff filed his original complaint against MOE. The reconstruction had not yet begun. Plaintiff sought a declaration that, under the policy, MOE is obligated to compensate plaintiff for replacement costs incurred more than two years from the date of loss. Plaintiff further alleged that MOE had breached the policy by refusing to pay replacement costs in excess of the amount of OHI's bid. Plaintiff also alleged a claim of negligence against Hopp, contending that Hopp had been negligent in failing to adequately assess the value of the house and in failing to write a policy of insurance with adequate coverage.
MOE moved for summary judgment. With regard to plaintiff's claim for a declaration that, under the policy, MOE is obligated to compensate plaintiff for replacement costs incurred more than two years from the date of loss, MOE argued that the policy required completion of construction as a condition for payment of replacement cost benefits, and plaintiff had not yet replaced the home. MOE asserted that, in order to have recovered replacement cost benefits over and above those that MOE had previously advanced, plaintiff had only been required to submit sufficient documentation to show that additional costs were necessary and actually spent on reconstruction. Further, MOE contended, although it had advanced plaintiff funds in excess of the actual cash value of the home, i.e., the policy limits for the dwelling, MOE did not have an obligation to do so under the policy and had no obligation to pay further benefits.
MOE argued in its motion for summary judgment that, as a matter of law, the unambiguous terms of the policy did not allow for recovery of replacement costs for work completed more than two years from the *630 date of loss.[2] MOE pointed out that the "settlement of loss" section of the policy requires that, in order to recover damages in excess of "actual cash value of the damage," the actual repair or replacement must be complete. In MOE's view, that requirement is a "policy provision" that must be complied with in order to recover replacement costs. MOE asserted that, in light of the two-year limitation on filing suit, and in view of the further requirement that "[n]o action can be brought unless the policy provisions have been complied with," necessarily, the replacement of a residence must be actually completed within two years of the loss in order to recover replacement costs, and no replacement costs incurred after the two-year limitation may be recovered.
The court denied MOE's summary judgment motion. The court rejected MOE's interpretation of the policy and its primary contention that only repairs and replacements completed within two years of loss are compensable. The court noted the policy's requirement that suit could not be brought until "the policy provisions have been complied with," and agreed that completion of construction was a condition for recovery of replacement costs, but disagreed with MOE's view that the policy required completion of construction within two years of the loss. In the court's view, the replacement cost provision "only addresses the measure of compensation to which an insured is entitled, not whether an insured is entitled to any compensation at all." (Emphasis trial court's.) The court noted that the policy does not state an explicit time limitation on repairs or replacement. Citing Bourrie v. U.S. Fidelity and Guaranty Ins. Co., 75 Or.App. 241, 707 P.2d 60 (1985), the court concluded that, in the absence of a time limit stated in the policy, the law implies a reasonable time limit within which replacement must be completed. Thus, the court held, the two-year limitation provision of the policy does not limit plaintiff to compensation for replacement costs incurred within two years from the time of loss, and it therefore rejected MOE's summary judgment motion. The court later ordered that the case be placed in abatement so that plaintiff could complete construction.
The case was removed from abatement and came to trial in July 2006, shortly before the completion of construction. At the beginning of trial, plaintiff sought a ruling from the trial court that Smith's letters had provided an interpretation of the policy that was binding on MOE and that required MOE to pay all replacement costs, as long as the replacement was of "like construction and use." The trial court agreed with plaintiff that Smith's letters provided an interpretation of the policy to which MOE was bound and, further, that the letters promised that MOE would pay for new construction as long as the new house was of "like construction and use." The trial court also granted plaintiff's motion in limine to limit trial to the question of whether the new house was of like construction and use, to exclude evidence of the amount that plaintiff had paid for the house that burned, and to exclude any evidence of plaintiff's failure to comply with conditions of the policy.
The trial court then allowed plaintiff to file an amended complaint, which alleged a new breach of contract claim against MOE, based on MOE's alleged refusal to pay plaintiff the actual cost of replacing the destroyed home with a home of like construction and use. The first amended complaint also added allegations that MOE had breached the contract by refusing to pay plaintiff more than $96,000 for loss of use, and more than $278,121.65 for loss of contents.
Plaintiff's amended complaint also alleged a negligence claim against Hopp, based on its *631 failure to adequately assess the value of the home before the fire; provide a policy with sufficient coverage for plaintiff's loss of the home and loss of use of the home; and have systems in place to ensure that the policy was properly issued and contained appropriate limits of liability. The first amended complaint also included an additional claim of negligence against MOE, asserting that MOE had been negligent in failing to obtain an appraisal of plaintiff's home; failing to determine the actual cash value or replacement cost of the home; issuing a policy with a limit of liability for loss of the dwelling that did not reflect the actual cash value or replacement cost of the home; and issuing a policy with insufficient limits of liability for loss of use.
MOE's answer asserted several affirmative defenses, among them failure to state a claim and failure to meet the policy's conditions of coverage. The trial court struck MOE's affirmative defenses as contrary to the promises expressed in Smith's letters. The trial court also denied MOE's request to exclude Smith's letters as irrelevant and to construe the policy as written rather than as interpreted in the letters. MOE continued during trial to assert the terms of the policy, but the trial court repeatedly ruled that the letters controlled the interpretation of the policy.
The trial court stated that "Smith's letters establish what the policy means. That's been the ground zero of this case from the very beginning." In response to a question from MOE's counsel as to whether the trial court had determined the meaning of the policy as a matter of law, the court replied, "Virtually." The court explained:
"[T]hose letters establish, if anything, that your company's obligated to pay for whatever [plaintiff] spent as long as what he was spending was reconstructing a house of like construction[.]"
At the close of plaintiff's case-in-chief, the trial court and the parties engaged in a colloquy concerning MOE's request to admit evidence of OHI's bid of $1.7 million as evidence of the amount necessary to replace the house with like construction. MOE's attorney explained:
"Our position throughout, and we've, of course, lost this position or this argument at every turn, is that I would present OHI and their bid to present evidence of the necessary cost to replace the house that burned."
Plaintiff's attorney then spoke:
"The only point that I would like to make, there was reference in [MOE's counsel's] comment, the term `necessary,' that it was the necessary amount to rebuild. Necessary is not a word that I have heard either in the policy or in any testimony, and I don't think the issue is what was necessary; I think the only issue is, as we've defined it, is whether what was built was of like construction."
MOE's attorney further explained the purpose of the testimony MOE proposed to offer:
"[OHI is] here to testify that their bid is the necessary cost to replace the house that actually burned down. And I'm trying to cite the policy language from memory, but the measure within the replacement cost provision is two-pronged. It says lesser of reconstructionthe cost to replace with like construction or use or the necessary cost to replace the building that actually burnt."
The trial court asked, "The policy uses the word `necessary'?" MOE's counsel then quoted the two paragraphs of the replacement cost endorsement,[3] and the court asked whether there was a difference between the two paragraphs. MOE's counsel explained:
"[T]he difference would be that the necessary amount to repair or replace the damaged building, that is specificallythat doesn't say like construction, that says the damaged building. It's specific to the *632 house that burned down, only the house that burned down."
The trial court expressed surprise at MOE's focus on the term "necessary," and said:
"[T]his is the first time that anybody is suggesting that this is an alternative in this case. The whole case has been tried based on like construction."
Plaintiff's counsel expressed the view that, as interpreted by Smith, the two paragraphs of the replacement cost endorsement provided essentially the same coveragereplacement cost of the total loss. The trial court then looked through Smith's letters and noted several references to the "necessary" cost to rebuild the home. The court commented, "So it's a recurring word and theme in all of these letters." The court then stated that it would allow the evidence of OHI's bid to come in for the purpose of establishing the amount necessary to replace the house.[4]
After further colloquy, however, the court again expressed the view that this was the first time that the "necessary amount to repair or replace the damaged building" had been suggested as a limitation on plaintiff's coverage.[5] The court then agreed with plaintiff's position that the emphasis in Smith's letters had not been on the "necessary amount," and the court refined its earlier ruling, explaining that the evidence of OHI's bid could be considered by the jury for the purpose of addressing the issue of "like construction." MOE's counsel disputed the trial court's conclusion that Smith's letters could be interpreted as somehow omitting the "necessary amount" limitation, but argued that, even if they could, the letters could not, under Oregon law, be understood to have altered the terms of the policy either by waiver or by estoppel, which, in any event, had not been pleaded by plaintiff.
Hopp and MOE moved for directed verdicts on plaintiff's negligence claims. The trial court concluded that the evidence was insufficient as a matter of law to establish causation and granted the motions.
MOE also sought a directed verdict on the breach of contract claim, asserting that there was no evidence that, at the time the lawsuit was filed, MOE was in breach of the contract. MOE contended that, in order to maintain a claim for breach of contract, all the elements of the claim must be satisfied at the time the complaint is filed and that, in this case, when the suit was filed, there had been no breach of contract. MOE further contended that, to the extent that plaintiff was arguing that there had been an alteration of the policy by either waiver or estoppel, that was not legally cognizable and had not been pleaded.
Plaintiff's counsel responded that plaintiff was not asserting estoppel, but that Smith's letters provided an interpretation of the policy on which plaintiff was entitled to rely and that was binding on MOE. Because of those letters, plaintiff asserted, MOE was required to pay all replacement costs for like construction. The trial court denied MOE's motion on the breach of contract claim and rejected MOE's contention that plaintiff was in effect *633 seeking a waiver or estoppel based on Smith's letters. The court adhered to its ruling that Smith's letters provided an interpretation of the policy that bound MOE.
Plaintiff then sought a directed verdict on the breach of contract claim, contending that "[t]here is no evidence in the record that this house is not like construction and use[.]" The trial court allowed the motion and entered judgment for plaintiff for damages based on the full amount spent to rebuild the house, $3.23 million, less the $1.7 million that MOE had previously advanced. The trial court further determined that MOE owed plaintiff an additional $24,000 for the loss of use of his home. The court awarded plaintiff pre- and post-judgment interest and attorney fees of approximately $500,000.
In its first assignment of error, MOE contends that the court erred in denying MOE's motion for summary judgment on the breach of contract claim.[6] In MOE's view, the policy requires as a condition for recovery of replacement costs that the replacement of the house be complete. Because plaintiff had not yet completed replacement of the house when the claim was filed, MOE contends, it had no obligation to pay replacement costs. MOE also asserts on appeal an additional argument made below in support of its motion for summary judgment that, despite the absence of an express time limitation on a claim for replacement costs, the policy implicitly limits those benefits to costs incurred within two years of the loss. That is so, MOE contends, because of the policy's two-year limitation on claims and the accompanying requirement that the insured comply with all provisions of the policy before bringing a claim. Accordingly, for either reason, MOE argues, there was no breach of contract because plaintiff is not entitled to further replacement cost benefits.
As plaintiff correctly points out, the denial of a motion for summary judgment generally is not reviewable, unless it is based on a purely legal contention that does not require the establishment of any predicate facts. Freeman v. Stuart, 203 Or.App. 191, 194, 125 P.3d 786 (2005). That means that the facts must not only be undisputed but also immaterial. Id. Because the question raised by the motion for summary judgment here cannot be resolved without reference to the predicate fact that plaintiff had not completed replacement of the home within two years, we conclude that, even if that predicate fact is undisputed, the ultimate issue is not purely legal. Thus, plaintiff is correct that the ruling denying the motion for summary judgment is not reviewable.
MOE's first assignment of error also challenges the trial court's denial of MOE's motion for a directed verdict on the breach of contract claim, in which MOE asserted that the claim had not been established because there was no evidence that MOE was in breach of the policy at the time the claim was filed. MOE asserts that the motion should have been granted, because plaintiff's claim was premature at the time it was filed.
Assuming, as MOE contends, that the claim was premature at the time it was filed because plaintiff had not yet completed construction of the home so as to trigger MOE's obligation under the policy to pay replacement costs, later events altered those circumstances. A motion for directed verdict is directed against the operative pleading and based on the evidence at trial, and our review is based on that same record. Plaintiff's breach of contract claim was held in abatement for two years pending completion of the home, and the home was two weeks shy of completion when the case came to trial. As noted, the trial court allowed the complaint to be amended during trial, and the first amended complaint made new allegations, including that MOE had breached the policy by refusing to pay plaintiff the actual cost of replacing the destroyed home. The trial court's allowance of the amended complaint is not challenged. At trial, plaintiff put on *634 evidence of the actual cost of replacing the home. In light of the events subsequent to the filing of the original complaint, and our review of the motion based on the operative pleading and the evidence adduced at trial, we conclude that the trial court did not err in denying the motion for directed verdict based on the original claim having been filed prematurely.[7]
In its second assignment of error, MOE challenges multiple rulings of the trial court, which it asserts depended on the trial court's erroneous conclusion that statements made by Smith in his letters to plaintiff could and did alter the meaning of the policy so as to bind MOE to pay all replacement costs of "like construction and for like use," without regard for the written provisions of the policy. Those rulings include allowing plaintiff's motion in limine to limit the issue for trial to whether the new house is of "like construction and use" to the house that burned; striking MOE's affirmative defenses based on plaintiff's failure to complete replacement of the home within two years of loss and before demanding payment from MOE; excluding evidence of the amount that plaintiff actually spent to build the house that burned; excluding evidence of plaintiff's failure to comply with policy provision; and, finally, granting plaintiff's motion for directed verdict on the breach of contract claim.
MOE is correct that the described rulings depend on the trial court's conclusion that Smith's statements provided an "interpretation" of the policy that precluded any inquiry into the meaning of the provisions of the document itself. However, we need not address whether it is impermissible under Oregon law for the trial court to treat Smith's letters as providing an interpretation of the policy that bound MOE. Compare DeJonge v. Mutual of Enumclaw, 315 Or. 237, 241, 843 P.2d 914 (1992) (an insurer is not estopped from denying coverage because of its agent's representation that the policy would provide coverage), with Farley v. United Pacific Ins. Co., 269 Or. 549, 558, 525 P.2d 1003 (1974) (an insurer's agent's interpretation of doubtful language in the policy binds the insurer, unless the interpretation is patently absurd). That is so because we agree with MOE that, to the extent that Smith's letters provided an interpretation of the policy, that interpretation was consistent with the policy's unambiguous terms.
The interpretation of an insurance policy is a matter of law, Employers Insurance of Wausau v. Tektronix, Inc., 211 Or.App. 485, 503, 156 P.3d 105, rev. den., 343 Or. 363, 169 P.3d 1268 (2007), and our objective in construing the policy is to determine the intent of the parties. Hoffman Construction Co. v. Fred S. James & Co., 313 Or. 464, 469, 836 P.2d 703 (1992). Under Hoffman, the first step is to examine the text of the policy to determine whether it is ambiguous. If it is not, the policy is interpreted in accordance with its unambiguous terms. Id. at 469-70, 836 P.2d 703. Accordingly, the court begins with "the wording of the policy, applying any definitions that are supplied by the policy itself and otherwise presuming that words have their plain, ordinary meanings." Tualatin Valley Housing v. Truck Ins. Exchange, 208 Or.App. 155, 159, 144 P.3d 991 (2006), rev. den., 342 Or. 344, 153 P.3d 124 (2007). If the wording of the policy is susceptible to more than one plausible interpretation, we examine the disputed terms in the context of the policy as a whole. Andres v. American Standard Ins. Co., 205 Or.App. 419, 424, 134 P.3d 1061 (2006). If, after such an examination, the ambiguity persists, we construe the policy against the drafterin this case, MOE. Id. Thus, the interpretation of an insurance policy is not to be resolved by reference to evidence extrinsic to the policy itself. Id.; cf. Dewsnup v. Farmers Ins. Co., 349 Or. 33, 239 P.3d 493 (2010) (holding that whether a plastic tarp was a *635 "roof" within the meaning of plaintiff's insurance policy was a question for the trier of fact).
In our view, the policy's provisions relating to the recovery of replacement costs are straightforward and not ambiguous. As we understand the replacement-cost endorsement, read in the context of the provisions for settlement of loss, in the event of a fire, plaintiff could recover either (1) the policy limits of $600,000 as stated on the declaration page; or (2) replacement cost benefits. When, as here, the loss is greater than $2,500, the policy required that, in order to recover replacement cost benefits, plaintiff must complete the replacement of the destroyed property. Thus, the completion of construction is a condition for recovery of replacement costs. Smith repeatedly referred to that requirement in his letters.
In Higgins v. Insurance Co. of N. America, 256 Or. 151, 469 P.2d 766 (1970), the Supreme Court explained the purpose and effect of replacement cost provisions in a fire insurance policy. The policy at issue in that case required the insurer to pay the actual cash value of the burned property and also included replacement cost coverage, under which the insurer agreed to pay the lesser of the "replacement cost of the building structure * * * on the same premises and intended for the same occupancy and use," or the "amount actually and necessarily expended in repairing or replacing said building(s) * * * for the same occupancy and use." Id. at 161, 469 P.2d 766. The plaintiffs had not expended any money to repair or replace the insured structure, and the insurance company contended therefore that the plaintiffs were not entitled to any benefits under the replacement cost provisions of the policy, but were entitled only to the actual cash value of the insured property under the basic coverage. Id. at 162, 469 P.2d 766.
In determining whether the plaintiffs were entitled to replacement cost coverage or to just their basic coverage, the court considered the relationship between the two types of coverage. The court quoted extensively from a bulletin published by the National Underwriter and from insurance treatises. As explained by those authorities, replacement cost coverage developed as a means to protect the insured from the risk of loss when, because of depreciation, the insured property costs more to rebuild than it was worth at the time of the fire. In that circumstance, the basic coverage does not even cover the insured's loss. Id. at 162-63, 469 P.2d 766. The authorities explained that replacement cost coverage is a type of coverage under which the insurer agrees to pay the difference between actual cash value and the full replacement cost. Id. The court recognized that replacement cost coverage creates a risk that the insured will intentionally destroy the insured property (referred to as "moral hazard"). For that reason, the court explained, replacement cost insurance is written only under definite limitations, the basic limitation being that "`the insured collects on this "new for old" basis only if the property is repaired or replaced.'" Id. at 163, 469 P.2d 766 (footnote omitted). Thus, the court explained, the risk of "moral hazard" is mitigated by the requirement that the property must actually be replaced before replacement cost benefits are owing. Id. at 165, 469 P.2d 766. The court concluded:
"The reasons for limiting recovery to the amount actually expended for repair or replacement seem reasonable, and such limitations should be enforced if it is clearly stated in the insurance contract. We think that the language employed in the policy under consideration is sufficiently clear, and that the intent to limit the company's liability to amounts actually expended is apparent from a careful reading of the replacement cost provision. We conclude that since plaintiffs have not expended anything in repairing or replacing the insured building they are not eligible to recover under the `Replacement Cost' extension of the policy."
Id. at 166, 469 P.2d 766.
MOE's replacement cost endorsement is similar to the provision that was at issue in Higgins, in that it expressly requires actual replacement of the destroyed property before the insured is entitled to recover replacement costs. We conclude that MOE is correct that, under the terms of the policy, in the absence of actual replacement, MOE had *636 no duty to pay more than the actual cash value of the destroyed property, up to a maximum of the policy limit, or $600,000.
The replacement cost endorsement states two limitations on the amount that can be recovered for replacement costs. If the insured elects to recover replacement costs, the insured is entitled to recover the lesser of (1) the cost of replacing the house with one of like construction and use; or (2) the amount necessary to rebuild the same house. Once again we agree with MOE that the policy is unambiguous. The two alternative limitations on the recovery of replacement costs require a comparison of the cost of replacing the house with one of like construction and the amount necessary to rebuild the same house. MOE is required to pay only the lesser of those two amounts. As the trial court noted, Smith's letters repeatedly made reference to the policy's requirement that benefits were limited to the amount necessary to rebuild the house that burned. Contrary to plaintiff's contention, MOE did not define the only issue at trial to be whether the rebuilt house was of like construction; the trial court did, in response to plaintiff's contention that Smith's letters had defined that requirement as the only limitation on replacement cost damages.
Further, also contrary to plaintiff's contention, we conclude that Smith's letters never promised that MOE could continue to pay replacement costs for expenses incurred more than two years from the date of loss. In fact, Smith warned plaintiff that
"[MOE] is concerned that you are running out of time if you choose to rebuild your house. In addition to the rental value time limitation, there is also a two-year limitation in your policy for you to bring suit against [MOE] if you feel that the company has breached the policy in any way. As stated in my letter of September 18th, we are concerned that you may lose some of the benefits you are entitled to under your policy if you don't get started on the rebuilding immediately."
The trial court's mistaken conclusion that Smith promised that MOE would pay all replacement costs incurred for like construction and useregardless of when they were incurredled the trial court to mistakenly refuse to consider MOE's contention, raised by way of affirmative defense, that there was no breach of contract because, under the terms of the policy, construction had not been completed within two years from the date of loss.
In summary, assuming, without deciding, that Smith's letters could have any bearing on the meaning of the policy, we have read them carefully, and we do not understand them to have altered the unambiguous terms of the policy in any respect. It is true, as plaintiff points out, that Smith told plaintiff that he could build the house that he wanted, with the builder of his choice, and that MOE would reimburse plaintiff for the costs to rebuild the house. However, Smith also consistently qualified those statements by reminding plaintiff that his right to replacement-cost coverage was subject to the conditions and terms of the policy, including the requirement that construction actually be completed and that MOE would pay only the lesser of the cost of replacing the house with one of like construction and use or the amount necessary to rebuild the same house. We conclude, therefore, that the trial court erred in concluding that Smith had interpreted the conditions and limitations on recovery of replacement costs to vary from the terms of the written policy.[8] We further conclude that the court committed corresponding errors in the several rulings that were dependent on that underlying conclusion, including granting plaintiff's motion for a directed verdict on the breach of contract claim, striking MOE's affirmative defenses, prohibiting MOE from arguing that MOE had not breached the policy because plaintiff had not completed replacement of the house within two years from the date of loss, and excluding the evidence that MOE offered to establish that plaintiff's actual replacement costs exceeded the amount necessary to rebuild the same house. Accordingly, *637 we reverse the trial court's judgment for plaintiff on the breach of contract claim and remand for a new trial.
On cross-appeal, plaintiff contends that the trial court erred in granting Hopp's motion for a directed verdict on the claim of negligence. In reviewing the trial court's ruling, we view the evidence and all reasonable inferences in the light most favorable to plaintiff. A directed verdict for the defendant on a negligence claim is proper only if there is no evidence from which the jury could have found the facts necessary to establish the elements of the claim. Or. Const, Art. VII (Amended), § 3; Brown v. J.C. Penney Co., 297 Or. 695, 705, 688 P.2d 811 (1984); Ballard v. City of Albany, 221 Or.App. 630, 639, 191 P.3d 679 (2008).
Plaintiff explains that his negligence claim is directed primarily at the "loss of use" coverage in the policy. He argues, essentially, that there is evidence from which the jury could have found that, as an independent insurance broker, Hopp owed plaintiff a duty of reasonable care, see Lewis-Williamson v. Grange Mutual Ins. Co., 179 Or.App. 491, 495, 39 P.3d 947 (2002), that Hopp breached that duty by undervaluing plaintiff's home, and that that undervaluation necessarily resulted in a similar understatement in the policy's limit for loss of use. Plaintiff emphasizes Hopp's failure to obtain an appraisal before determining the policy limits.
In granting defendants' motion for a directed verdict on the negligence claim, the trial court was persuaded by Hopp's contention that plaintiff had failed to establish that any negligence on Hopp's part in undervaluing the property caused plaintiff's damages. In particular, the trial court was persuaded by Hopp's argument that there was no evidence of what an appraisal would have shown or that an appraisal would have made any difference in plaintiff's coverage.
Plaintiff cites two Supreme Court opinions, Sandford v. Chev. Div. Gen. Motors, 292 Or. 590, 642 P.2d 624 (1982), and Fazzolari v. Portland School Dist. No. 1J, 303 Or. 1, 734 P.2d 1326 (1987), for the rule that "causation" in the context of a negligence claim means "cause in fact." Plaintiff argues that, despite the absence of an appraisal valuing the house that burned at more than $600,000, the jury could have found, based on the evidence in the record, that Hopp undervalued the house, and plaintiff asserts that the jury should have been given the opportunity to decide whether Hopp's negligence in failing to obtain an appraisal was a cause in fact of Hopp's failure to obtain a policy with the proper face value.
We agree with plaintiff that, under the standard for review of a directed verdict, there was some evidence from which a jury could have found facts necessary to establish that Hopp, as an independent agent, owed a duty of care to plaintiff, see Lewis-Williamson, 179 Or.App. at 495, 39 P.3d 947, and that his failure to obtain an appraisal constituted a breach of that duty. Further, even in the absence of an appraisal, there was evidence from which a jury could have found that the house that burned had a value higher than $600,000. Although there was no explicit evidence that, had the house been appraised at a higher value, Hopp would have obtained a policy for plaintiff with a dwelling limit higher than $600,000, that is a reasonable inference from the evidence.[9]
The difficulty with plaintiff's case, however, is that, even assuming that the jury could find that Hopp was negligent, that an appraisal would have shown a value for the burned house higher than $600,000, and that plaintiff would have purchased a policy to cover that higher value, there was no evidence as to what that different policy might have provided in the way of limits for loss of use. MOE did not offer dwelling coverage in excess of $600,000, and plaintiff did not offer evidence of the loss-of-use coverage that might have been available from a different company. Further, because there is no evidence of the value of the house that burned, there is no evidence from which the jury could have inferred the limits of plaintiff's loss-of-use coverage had plaintiff obtained a policy with higher coverage for the dwelling. To survive a directed verdict *638 motion on his negligence claim, plaintiff must establish damages and their cause to a reasonable certainty. Parker v. Harris Pine Mills, Inc., 206 Or. 187, 197, 291 P.2d 709 (1955); see Burrough v. Twin Oaks Memorial Garden, Inc., 110 Or.App. 325, 822 P.2d 740 (1991) ("Although uncertainty as to the amount of damages will not always prevent recovery, when the evidence as to whether a plaintiff will suffer any economic damage from a defendant's negligence is left to mere speculation, there is no right to recovery."); McKinley v. Owyhee Project North Board of Control, 103 Or.App. 253, 265-66, 798 P.2d 673 (1990). In the absence of evidence of the value of the house that burned or of the loss-of-use coverage that plaintiff would have obtained had he insured the property at that higher value, we conclude that any finding of damages would have been speculative. Accordingly, the trial court did not err in granting Hopp's motion for directed verdict on plaintiff's negligence claim.
On appeal, reversed and remanded for new trial; on cross-appeal, affirmed.
NOTES
[1] Plaintiff sued both Hopp Insurance Agency and its owner, Randy Hopp, who was dismissed before trial. For convenience, throughout this opinion, we refer to both of them as Hopp.
[2] The policy provides:

"Suits Against Us. No action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss."
The "Suits Against Us" provision satisfies the requirement of ORS 742.240:
"A fire insurance policy shall contain a provision as follows:
"No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, and unless commenced within 24 months next after inception of the loss."
[3] As noted above, under that endorsement, in the event of loss, as an alternative to payment of the liability limit of $600,000 stated on the declarations page, MOE agreed to pay

"not more than the lesser of:
"1. The replacement cost of that part of the building damaged for like construction and use on the same premises; or
"2. The necessary amount required to repair or replace the damaged building."
[4] The following colloquy then occurred:

"[MOE's counsel]: Okay. And just to make sure I understand then, so the policy language[MOE's] obligations and the policy obligations have not changed in any way by [Smith's] letters, correct?
"THE COURT: Well, getting back to the first day of trial when you actually say to the jury, on the one hand, yes, that's true; on the other hand, [Smith's] letters clarify, I think, and make it clear what those provisions mean.
"[MOE's counsel]: Okay. So where the policy replacement cost provision says that, `We will pay not more than the lesser of,' number one, `replacement cost of that part of the building damaged for like use and construction of the same premises'; or, two, `the necessary amount required to repair or replace the damaged building.'
"THE COURT: I don't see a difference between those two phrases having a logical and factual effect on this case, so if you want to emphasize necessary and [plaintiff's counsel] wants to emphasize what his client did and that it was reasonable and it was necessary to spend that money to get what was of like construction and, in fact, you wind up with what is less, I think you can both make those arguments."
[5] Plaintiff's counsel posited that the "necessary amount required to repair or replace the damaged building" as stated in the replacement cost endorsement was the alternative that applied in the event that the insured decided not to rebuild. The trial court agreed with that interpretation.
[6] MOE's motion for summary judgment was directed against both the breach of contract and declaratory judgment claims. We note that, on appeal, MOE does not assign error to the trial court's denial of its motion for summary judgment on the declaratory judgment claim. Instead, MOE notes that the court ultimately ruled in plaintiff's favor on the contract claim and in MOE's favor on the negligence claim and that, because the judgment does not mention plaintiff's claim for declaratory relief, that claim is deemed to have been dismissed with prejudice.
[7] In support of this assignment, MOE also makes other arguments as to why the trial court erred in denying its motion for directed verdictessentially the same arguments made in support of its summary judgment motion. However, those other argumentswhich include the contention that MOE was not in breach of the policy because replacement cost benefits were not due until construction was complete and that no replacement costs benefits were due for repairs or replacement not completed within two years from the date of losswere not argued below in support of MOE's motion for directed verdict, and we therefore will not consider them under this assignment of error as a basis for reversing the trial court's ruling.
[8] In view of our conclusion regarding the significance of Smith's letters, we need not address MOE's contention that waiver and estoppel are not bases for disregarding the express terms of the policy.
[9] Hopp testified that plaintiff told him that the $600,000 limit for the addition was adequate, because plaintiff was going to be his own contractor. Plaintiff disputed that testimony.